# UNITED STATES DISTRICT COURT
for the
Eastern District of California

**FILED**
AUG 19 2019
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

| | |
|---|---|
| United States of America<br>v.<br><br>MANUEL S. CARDENAS<br><br>*Defendant(s)* | )<br>)<br>) Case No.<br>)<br>)<br>)<br>)   2:19 - MJ 0133 - ___ EFB |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **April 14, 2019 through August 4, 2019** in the county of **Trinity, California** in the **Eastern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Manufacture of Marijuana |

This criminal complaint is based on these facts:

See Attached Affidavit

☒ Continued on the attached sheet.

*Complainant's signature* (by telephone authorization)

Special Agent Nickolas Roe, U.S. Forest Service
*Printed name and title*

Attested to by the applicant by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1:

Date: 8-19-2019

*Judge's signature*

City and state: Sacramento, California

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF
## U.S. FOREST SERVICE SPECIAL AGENT NICKOLAS ROE

I, Nickolas Roe, being duly sworn on oath, depose and say as follows:

### PURPOSE

1. This Affidavit is made in support of criminal complaints and arrest warrants for the following persons for violations of 21 U.S.C. § 841(a)(1) (manufacture of marijuana):

   a. Genaro L. MERINO;
   b. Manuel S. CARDENAS

### AFFIANT'S BACKGROUND, TRAINING, AND EXPERIENCE

2. I am a Special Agent with the United States Forest Service (USFS), stationed on the Shasta-Trinity National Forest. I have been employed by the USFS since 2001 and was a uniformed Forest Service Law Enforcement Officer (LEO) from 2007 to 2010.

3. I am a "law enforcement officer" "of the United States" within the meaning of 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of, and to initiate arrests for, various offenses involving national forest lands, including Title 21 offenses outlawing the manufacture of marijuana. In December 2010, I became a Special Agent. This matter relates to an ongoing investigation being conducted by the USFS. This Affidavit is based upon my training, experience, personal knowledge of the facts of this case, and conversations with other law enforcement officers. This Affidavit does not purport to set forth all of my knowledge of this matter nor does it contain every detail of the investigation; rather it contains only facts sufficient to establish probable cause for issuance of the requested arrest warrant.

4. I am a graduate of the Land Management Police Training Program and Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I also have the arrest powers of a California State Peace Officer, pursuant to Sections 830.8(a) and (b) of the California Penal Code, and have completed the training required by the State of California, pursuant to Penal Code Section 832. All of my training included curriculum focused on controlled substance investigations.

5. My primary duties include detecting, investigating, apprehending, and prosecuting criminal activity associated with controlled substance production and use, on and relating to, National Forest System lands. I have been both the lead and assisting investigator in numerous controlled substance investigations and have arrested or cited dozens of persons for possession, manufacturing, transportation and sales of various controlled substances and illegal drug paraphernalia. While employed as a Law Enforcement Officer and later Special Agent, I have

investigated over 100 large-scale outdoor marijuana grow sites on federal, state, tribal, and private lands. The marijuana grow sites have been in various stages of production. As a result of investigating these marijuana grow sites, I have become familiar with methods and practices used by the marijuana manufacturers to locate, set up, cultivate, harvest and conceal their marijuana grow sites. I have also become familiar with methods and practices used to re-supply the grow sites and remove harvested marijuana from the mountains. As a result of these investigations, I have learned that the primary means of communication between the marijuana garden growers and the other members of their marijuana manufacturing organization is by cellular telephone. During the course of these investigations, I have had the opportunity to interview suspects involved in the cultivation and transportation of marijuana for distribution. During these interviews, I have gained knowledge of the methods and practices used to grow and process marijuana, evade detection from law enforcement, communicate with other members of their marijuana manufacturing organization, and transport marijuana and supplies on National Forest lands. I have also observed, at roadside drop points connected by trail to marijuana grow sites, suspects dropping off supplies and personnel to be delivered to the marijuana grow sites. I have also observed processed marijuana that was carried from the marijuana grow site areas being removed by vehicle from roadside drop points. I also have experience detecting marijuana grows through aerial reconnaissance and have spotted numerous marijuana grow sites by air surveillance. I have 11 years of on-the-job training and experience in tracking people through the mountains in a variety of conditions and situations. I have used these skills in search and rescue situations and to detect and track marijuana growers on numerous occasions. I am also responsible for investigating other crimes that occur on USFS land including arson, resource and property damage, and theft.

6. During my career, I have conducted or participated in controlled substance investigations, including conspiracies to manufacture, distribute, and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and the manufacture, distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). These investigations targeted drug trafficking organizations primarily engaged in the sale, manufacture, importation, and distribution of marijuana. In some instances, these investigations have targeted drug trafficking organizations also engaged in the sale, manufacture, importation, and distribution of cocaine, methamphetamine, and other controlled substances. During the course of my work, I have had the opportunity to converse with numerous law enforcement officers, informants, and drug traffickers as to the methods and practices regarding the manufacture, importation, transportation, distribution, and sale of controlled substances. I have been the affiant on various federal arrest and search warrants, and have testified in the federal Grand Jury in the area of controlled substances.

7. Through prior investigations and training, I have become familiar with the types and amounts of profits made by drug dealers and the methods and well as coded language and terms that are used to describe drugs and drug trafficking. I am familiar with and have participated in various

investigative methods including, but not limited to, visual surveillance, interviewing of witnesses, writing and executing search warrants, and using confidential informants. I have worked joint investigations with various experienced law enforcement officers who are trained in controlled substance investigations and I have drawn from their knowledge and expertise in the field of drug enforcement.

8. Drug traffickers often possess firearms and other dangerous weapons to protect themselves and/or their contraband from other criminals who might want to steal the drug traffickers' drug contraband and/or proceeds, and against law enforcement. Based on my training, experience and discussions with other experienced drug agents, I know that firearms are often found at marijuana manufacturing sites on public lands for these purposes.

9. I know that marijuana traffickers often manufacture marijuana on public lands throughout the country, including the Eastern District of California.

10. Based on my training and experience, through discussions with experienced drug investigators, and through the information I have learned through investigations, I know that most outdoor live-in marijuana manufacturing operations are conducted in a similar manner. Outdoor marijuana manufacturing operations involving large number of marijuana plants require substantial and continual labor to tend to the plants, provide logistical support for the labor force tending to the plants, and provide financial support until proceeds for the processed marijuana are received.

11. Outdoor marijuana manufacturing organizations often start exploring and scouting potential cultivation sites in the late winter and early spring. These organizations are normally in search of areas in which the snow melts comparatively early, that are in close proximity to a viable water supply, and that are isolated to avoid encounters with recreationalists and other members of the public. Most outdoor marijuana manufacturing organizations desire to plant marijuana plants as early as possible in order to harvest the plants as early as possible and potentially plant and harvest a second crop for the year before it becomes too cold in the late fall and early winter. Additionally, during scouting excursions, these organizations attempt to identify roadside drop points that can be utilized for the delivery of supplies, equipment and people, which are in close walking proximity to the cultivators' trail heads and/or cultivation sites. A roadside drop point is a designated location where the drivers can deliver equipment, supplies and workers for the cultivations sites. Roadside drop points are normally located along a rural route so that the cultivation workers can carry the delivered supplies to the camp area, on the one hand, and the marijuana from the grow site to the roadside drop point, on the other hand. It is normal for the marijuana manufacturers to establish a distinct trail system near the roadside drop points. On most occasions, these organizations favor their roadside drop points to be located in remote areas where law enforcement and recreational traffic is scarce in order to avoid detection.

12. Once an outdoor marijuana manufacturing organization identifies possible cultivation sites, the organization engages in procuring needed supplies to prepare the land and locate and develop

a water source for the cultivation site. In many cases, fertilizers, herbicides, pesticides and irrigation equipment are acquired from various vendors, as well as through illegal sources, such as through smuggled items brought into the United States.

13. As equipment and supplies for the marijuana grow site are procured, the outdoor marijuana manufacturing organization starts to deliver items to the area of the marijuana manufacturing site. Usually, these items are delivered to the pre-designated roadside drop points.

14. The land is prepared for planting and watering of the marijuana plants. Once a natural water source is identified and accessed, an irrigation system is constructed. The natural vegetation is cut, removed, or thinned to make space for the marijuana plants. Usually, locations for one or more active camps for the marijuana workers is also established. After the land has been prepared for planting, the marijuana seeds or cloned marijuana plants are placed into the ground.

15. Throughout the growing season, which typically lasts between three and six months, various supplies, equipment, and groceries are purchased by or provided by individuals who deliver the supplies to the grow sites. These individuals are frequently referred to as "lunch men." The lunch men deliver needed supplies and workers to the designated roadside drop point. The lunch men also retrieve processed marijuana from the grow site and pick up workers from the marijuana grow site.

16. As the marijuana plants mature, more workers arrive at the cultivation site(s) to help with the labor involved in harvesting and processing of the marijuana buds. The harvested marijuana is laid out to dry in processing areas within the marijuana manufacturing cultivation site and as it becomes dried it is packaged and moved to the roadside drop point for pick up by the drivers for delivery to the distribution centers or to the organization's leadership.

17. Outdoor marijuana manufacturing organizations recently have become more dependent on the use of cellular telephones to facilitate communications in furtherance of their marijuana manufacturing scheme. Cellular telephones are used to communicate among co-conspirators, distributors, purchasers, drivers, the laborers in the grow site, and the organization's leaders. Communications include coordinating the procurement of supplies and equipment and oversight of the progress of the tended to marijuana plants. Some cultivation sites are located in areas where there is no cellular phone service. In these situations a designated check in time is established in which the growers walk to an area where there is cellular service to place their cellular telephone calls.

18. Upon completion of harvesting the marijuana plants, the sites are abandoned, leaving behind materials such as pesticides, herbicides, fertilizers, trash, propane tanks, and food items. The items left behind attract wildlife, such as bears, which attempt to eat the discarded items. The by-products of marijuana manufacturing have the capability of harming the environment and wildlife, and contaminating nearby water sources, such as creeks and streams.

19. My awareness of these drug trafficking practices, as well as my knowledge of marijuana manufacturing and distribution techniques as set forth in this Affidavit, arise from the following:

    (a) My training in controlled substance investigations;

    (b) My past experience in outdoor marijuana manufacturing investigations;

    (c) My involvement in this drug investigation;

    (d) what other experienced drug agents have advised me when relating the substance of debriefings of confidential informants and cooperating individuals in prior drug investigations and the results of their own drug investigations; and

    (e) Other information provided through law enforcement channels.

## II. STATEMENT OF PROBABLE CAUSE

20. On April 11, 2019, U.S. Forest Service Law Enforcement Officer Logan Brown (Officer Brown), Sergeant Nathaniel Trujillo (Sgt. Trujillo), and California Fish and Wildlife Warden Barry Powell (Warden Powell) conducted foot reconnaissance by East Fork Road near the town of Helena in Trinity County, State and Eastern District of California. Warden Powell located rolls of black water line and empty cans of Modelo beer lying on the ground near what appeared to be a well-used human trail. It should be noted that this portion of trail is not a Forest Service trail and it is likely that the suspects created it. At approximately 11:15 a.m., Officer Brown observed two males removing forest vegetation from the trail, making it wider. Officer Brown was approximately fifty (50) yards away from the two males when he observed them on the trail. The trail itself led to East Fork Road where a tan colored boot was observed. Officer Brown, Sgt.. Trujillo, and Warden Powell left the area because of their close proximity to the suspects, which could have compromised the investigation. Based on my training and experience, as well as the evidence gathered in this investigation, I believe the location where the suspects' trail and East Fork Road intersect was a drop point for the suspects to receive supplies to manufacture marijuana such as: waterline, pipe fittings, digging tools, fertilizer, and scissors for processing the marijuana.

21. On April 12, 2019, Trinity County Sheriff's Department Deputy Bryan Pedrotti (Deputy Pedrotti), Warden Powell, and Sgt. Trujillo went back to East Fork Road and the intersection of the suspects' trail. While at that location Sgt. Trujillo observed fresh tire tracks in the mud at the suspected drop location on both sides of the road. The tracks appeared to be caused by a vehicle making a U-turn at that location. Additionally, the tire tracks appeared to come from a larger vehicle, possibly a truck. Warden Powell and Sgt. Trujillo walked up the suspects' trail approximately one hundred (100) to one hundred and fifty (150) yards and observed several boot

tracks, strands of string, old clothing, fresh orange peels, and limes that had recently been cut. Before leaving the area Warden Powell and Sgt. Trujillo installed surveillance equipment.

22. Surveillance images from Saturday, April 13, 2019 at approximately 5:00 p.m. depict two Hispanic males walking on the trail towards the staging area. The staging area is a relatively flat area, concealed by vegetation, and approximately 30 yards above East Fork Road. Surveillance captured on Sunday, April 14, 2019 shows Hispanic males arrived that day at the intersection of East Fork Road and the suspects trail (the drop point) in a white Toyota sedan. A Hispanic male exited the Toyota wearing a T-shirt, shorts, and black socks. That Hispanic male met with another Hispanic male and the two of them unloaded supplies from the vehicle including a tent, a small green bag, and a case or half case of Coors Light beer. Surveillance equipment also captured audio of the suspects talking in Spanish. Further surveillance shows that the suspects walked from the drop point towards the staging area carrying backpacks that appeared fuller than in previous pictures. The suspects appeared to make several trips between the staging area and the drop point. Surveillance shows one suspect wearing a Boston Red Socks baseball hat; this suspect was later identified as **Manuel S. CARDENAS (CARDENAS)**. The other suspect as wearing a blue bandana and later puts on a San Francisco Giants baseball hat and was later identified as **Genaro L. MERINO (MERINO)**. (See Attachment A-1 for photographs of the suspects). Surveillance shows **MERINO** wearing a blue bandana and holding what appears to be a large caliber rifle with a wooden stock at approximately 10:33.31 a.m. on April 14, 2019.

23. Surveillance captured on April 16, 2019, shows two Hispanic males walked towards the staging area, utilizing the same trail and carrying backpacks. The two Hispanic suspects appeared to make several trips to and from the staging area. One suspect is wearing a Boston Red Socks baseball hat and appears to be **CARDENAS** and the other is wearing a San Francisco Giants baseball hat and appears to be **MERINO**. I have learned through my training and experience that it is very common for suspects who cultivate marijuana on the National Forest to stage supplies near the drop point and make several trips between their camp and the staging area to transport the supplies over a few days.

24. Surveillance captured on April 17, 2019 shows two Hispanic males walked to the staging area transporting supplies to what is suspected to be their camp. The surveillance captured the suspects wearing the same baseball hats as before; they appear to be **CARDENAS** and **MERINO**.

25. Surveillance captured on April 20, 2019 shows two Hispanic males moved more supplies from the staging area back to the suspected camp. One suspect is wearing a Boston Red Sox baseball hat and appears to be **CARDENAS** and the other is wearing a San Francisco Giants baseball hat and appears to be **MERINO**.

26. Surveillance captured on April 21, 2019, shows a third suspect following two Hispanic males towards the staging area. The unidentified suspect, First Name Unknown ("FNU"), Last Name Unknown ("LNU") had a short beard and was wearing a green shirt, dark pants, and a hat that appeared black in color. Suspect FNU LNU walked to and from the staging area carrying a backpack that appeared black in color.

27. Surveillance captured on April 23, 2019, shows suspect FNU LNU traveled towards the staging area carrying a black backpack and was followed by a Hispanic male who appeared to be **CARDENAS** carrying a faded green backpack. Suspect FNU LNU was wearing a grey and black flat-billed hat.

28. On April 25, 2019, Sgt. Trujillo serviced the surveillance equipment and observed shoe and boot tracks on the trail the suspects created. At that location Sgt. Trujillo observed and photographed blue cable tied to the base of an oak tree. The cable was tied to a burlap bag that was hanging approximately ten (10) to fifteen (15) feet up the tree. Sgt. Trujillo also discovered fresh trash including an empty Coors Light beer can.

29. On May 1, 2019, Sgt. Trujillo and I went to the drop point and staging area to service surveillance equipment and inspect the drop point for signs of use. I observed fresh tracks on the suspects' trail and a clear plastic bag containing radishes at the staging area. Furthermore, I observed three dead Manzanita branches laying lengthwise on a portion of the suspects' trail that had become very worn from heavy use. From my training and experience I recognized the Manzanita branches as an attempt to conceal the trail. Additionally, Sgt. Trujillo and I found a cache of supplies including Coors Light beer and a propane tank concealed under a tarp near the suspects' staging area. Sgt. Trujillo and I left the area and returned to the Trinity County Sheriff's Department to review any activity that surveillance captured. Surveillance showed a vehicle arrived at the drop point on Sunday, April 28, 2019 at approximately 5:01 a.m. and left the drop point at approximately 5:07 a.m. Surveillance was unable to obtain the license plate, make, model, or color of the vehicle. However, I have learned through experience that supply drops for suspects who cultivate marijuana on public land happen approximately two weeks apart. Surveillance shows that the vehicle bringing the supplies arrived and departed the drop point quickly.

30. On May 14, 2019 Sgt. Trujillo and Warden Powell drove to the drop point located on East Fork Road and the intersection of the suspects' trail. While there, they surveyed the area and discovered fresh vegetation that had been crushed in the ditch where it intersects the suspects' trail. Furthermore, the trail itself had fresh vegetation that had been crushed. Surveillance captured on Monday, May 13, 2019 at approximately 8:56 a.m., shows a vehicle arrived at the drop point, backed up to the trail, and parked. The vehicle left after a few minutes and traveled toward California State Highway 299. Surveillance captured the California license plate of the

vehicle bearing tag #84455G2. The vehicle is a 2007 Dodge pickup, registered to **Jose MARTINEZ** at 11839 McKinley Road, Herald, California 95638. **Jose MARTINEZ** was run by Trinity County Sheriff's Department Dispatch and two possible hits: **Jose Manuel MARTINEZ**, born in 1988 and **Jose Valdez MARTINEZ**, born in 1950. Both **Jose Manuel MARTINEZ** and **Jose Valdez MARTINEZ** had a listed address of 11839 McKinley Road, Herald, California. Sgt. Trujillo and Warden Powell looked at the video of the supply drop that had occurred on April 14, 2019 at approximately 8:30 a.m. After watching the video Warden Powell believed the license plate of the Toyota Sedan was registered in California with tag #8CLF145. A registration check on California tag #8CLF145 showed it was a 2017 Toyota Sedan, also registered to **Jose MARTINEZ** at 11839 McKinley Road, Herald, California 95638. It is approximately 250 miles one way from 11839 McKinley Road, Herald, California to the drop point on East Fork (Helena) Road.

31. On August 4, 2019, law enforcement officers and agents hiked into the Helena marijuana cultivation site following a well-established foot trail that was likely created by the suspects. Law enforcement officers and agents walked from East Fork Road on the suspects' trail past the suspects' stash point to their camp and marijuana garden. While walking the trail I observed several empty cans of Tecate beer and an empty bottle of Corona. I continued following the trail, which led me to a camp approximately 2.6 miles away from the drop point. The camp consisted of three sleeping areas under tarps suspended in the air by trees. Furthermore, I observed a two burner propane cook stove, multiple items of food, clothing, SKS assault rifle, Bugle tobacco, a backpack that appeared black in color, cookware, sleeping bags, a car battery, boots, processed marijuana, trimming scissors, empty Tecate beer cans and Modelo beer cans. Some of these items had been discarded in trash bags and some were scattered throughout the sleeping area. The SKS assault rifle appeared to be the same firearm held by MERINO on April 14, 2019. Additionally, there was water flowing from a black water line that extended into the camp. Based on my training and experience I believe this water line had recently been used to wash dishes.

32. Law enforcement officers and agents continued to follow several different well-used trails that extended out of the suspects' camp. One trail system from the camp continued downhill in a southeast direction and lead to a lower plot of marijuana. Law enforcement officers and agents counted 1,154 marijuana plants (this number includes stalks that were still in the ground as well as plants that the suspects had already harvested). Another trail extended from the suspects' camp uphill in a northwest direction. I followed the trail northwest from the suspect's camp and observed fresh boot tracks on the trail. The trail traversed uphill for approximately two miles and ended at an upper plot of marijuana. Law enforcement officers and agents encountered two suspects walking down the trail from the upper plot of marijuana. One of the suspects was apprehended and identified as **CARDENAS**. **CARDENAS** was wearing a Boston Red Sox baseball hat.

33. Approximately 30 minutes later a third suspect was apprehended in the upper marijuana plot. The suspect was identified as **MERINO**. **MERINO** was wearing a San Francisco Giants baseball hat and had a cellphone in his pants pocket. An Adidas backpack that was black and pink in color was in **MERINO's** possession at the time of his arrest. Items found inside the backpack included: miscellaneous items, a bag of Bugle tobacco and clothing. Law enforcement officers and agents counted 734 marijuana plants from the upper plot.

34. It should be noted, that the suspects' camp was centrally located between the upper and lower marijuana plots and connected by trails that were well-worn and appeared to have been established by the suspects. There was a total of one-thousand eight-hundred and eighty-eight (1,888) marijuana plants counted in the Helena marijuana cultivation site. **See Attachment A-2**

Respectfully submitted,

Nickolas Roe
Special Agent
United States Forest Service

(by Telephone authorization)

Attested to by the applicant by telephone
in accordance with the requirements of
Fed. R. Crim. P. 4.1.

Hon. Edmund F. Brennan
U.S. MAGISTRATE JUDGE

Approved as to form by AUSA Michael W. Redding

## ATTACHMENT A-1

Photo 1 of **Genaro L. MERINO** who appears to be standing at a staging area approximately 30 yards above the intersection of East Fork Road and the suspects trail. This photo was captured on April 14, 2019 at approximately 10:33.31 a.m.



Photo 2 of **Genaro L. MERINO** holding the rifle later recovered from in the camp/marijuana garden. This photo was captured on April 14, 2019 at approximately 10:33.32 a.m.



Photo 3 of **Genaro L. MERINO** at the staging area on August 2, 2019 with supplies.



Photo 4 of **Genaro L. MERINO** be booked into Trinity County Jail on August 4, 2019.



TRINITY COUNTY SHERIFFS OFFICE
Number: 2042

Photo 1 of **Manuel S. CARDENAS** at the staging area on April 21, 2019.



Photo 2 of **Manuel S. CARDENAS** being booked into Trinity County Jail on August 4, 2019.



## ATTACHMENT A-2
Google Earth image of upper marijuana plot, camp, lower marijuana plot and drop point.